No. 70,537

STATE OF KANSAS, *Appellee*, v. BENNIE L. PLUNKETT, JR.,
*Appellant*.

(891 P.2d 370)

Opinion
filed March 10, 1995.

*Stephen C. Moss*, special assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This case concerns judicial misconduct during trial. Defendant Bennie L. Plunkett, Jr., was found guilty of rape, K.S.A. 21-3502, and aggravated criminal sodomy, K.S.A. 21-3506(c). His jury trial involved two consolidated cases, similar in nature, but each arising from a separate incident and separate victim. Plunkett contends he was denied a fair trial because of judicial misconduct. He also asserts various trial errors.

Our jurisdiction is under K.S.A. 1994 Supp. 22-3601(b)(1) (a maximum sentence of life imprisonment was imposed).

Our inquiry focuses on whether the trial judge committed judicial misconduct by making prejudicial comments about Plunkett, demeaning defense counsel in front of the jury, or otherwise showing partiality to the State's case.

Our standard of review is unlimited. The standard of judicial review refers to the legal scale used in weighing the sufficiency of the facts and circumstances giving rise to the alleged judicial misconduct. See *Dillon Stores v. Lovelady*, 253 Kan. 274, 275, 855 P.2d 487 (1993). We are required to decide whether Plunkett's substantial rights to a fair trial have been prejudiced. The scope of judicial review refers to the evidence the reviewing court will examine in reviewing allegations of judicial misconduct during trial. Under the appropriate scope of review, we measure the allegations of judicial misconduct during trial by examining the particular facts and circumstances surrounding the alleged misconduct. "Where a construction can properly and reasonably be given a remark which will render it unobjectionable, the remark will not be regarded as prejudicial." *State v. Thomas*, 252 Kan. 564, 570, 847 P.2d 1219 (1993). We are not able to effect such a construction in the instant case.

Plunkett's cases were tried to a jury. Plunkett's claim of judicial misconduct rests on many statements, interjections, and rulings by Judge Robert D. Watson during the five-day trial. We find the misconduct sufficient to require reversal.

## FACTS

Evidence was controverted. The State relied heavily on the testimony of the alleged victims, S.B., age 17, and C.D., age 20. Both episodes took place in Plunkett's home, about six weeks apart. Both victims described similar 30- to 60-minute ordeals in which they were coerced by force and threats into oral, vaginal, and, in S.B.'s case, anal sex. Plunkett, on the other hand, described both incidents as consensual. The victims admitted to being close acquaintances of Plunkett before the alleged crimes. S.B. had kissed him at least once in the preceding few weeks,

and C.D. had talked with Plunkett about having sex. The facts are disputed as to whether the relationships were consensual or criminal.

The jury's impression of the credibility of S.B., C.D., and Plunkett had to be crucial to its verdict. A detailed recitation of the facts is not necessary to develop an understanding of the issues.

## DISCUSSION

Plunkett contends that the cumulative effect of several instances of judicial misconduct during trial severely prejudiced his right to a fair trial. We agree. He cites *State v. Hamilton*, 240 Kan. 539, 731 P.2d 863 (1987), in which we reversed a conviction because of judicial misconduct by Judge Watson. See also *State v. Lewis*, 252 Kan. 535, 539, 847 P.2d 690 (1993). Complaints concerning Judge Watson during trial appear in several published opinions cited in *State v. Gadelkarim*, 256 Kan. 671, 677, 887 P.2d 88 (1994).

We have identified principles to guide the demeanor of trial judges:

"The trial judge is not merely a moderator, but is the governor of the trial. The judge must strive to have the trial conducted in an atmosphere of impartiality and should refrain from remarks or conduct that may injure a litigant."

"The trial judge should be the exemplar of dignity and impartiality. He should exercise restraint over his conduct and utterances. He should suppress his personal predilections, and control his temper and emotions. He should not permit any person in the courtroom to embroil him in conflict, and he should otherwise avoid conduct on his part which tends to demean the proceedings or to undermine his authority in the courtroom. When it becomes necessary during the trial for him to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, he should do so in a firm, dignified, and restrained manner, avoiding repartee, limiting his comments and rulings to what is reasonably required for the orderly progress of the trial, and refraining from unnecessary disparagement of persons or issues." *Hamilton*, 240 Kan. 539, Syl. ¶¶ 3, 4.

### Jury Orientation

During jury orientation, Judge Watson described the courtroom to potential jurors as a "stage" and the lawyers as "actors." He then made the following comment:

"At the first table which is usually—I don't know why, but it seems like prosecution and defense stakes out things in the courtroom. And I think you think you get habit bound, so do these lawyers. It just looks like *all the time the prosecution will sit at the table closest to the judge and the defense will sit— defense will sit furthest away. Sometime I wonder about that, but I say, oh, but, Watson, don't be thinking evil. You know, defense trusts you, too, you know,* but anyhow, that's what usually happens." (Emphasis added.)

He referred to District Attorney Nola Foulston as "your elected representative" and, "to me, as far as Sedgwick County goes, *the most powerful individual there is in the judicial system.*" (Emphasis added.) He then introduced the prosecutor, an assistant district attorney, stating, "I've had the luck to have seen her come up through the ranks and she couldn't be any better trained than if I trained her." Judge Watson then described the summer intern procedure in the Sedgwick County prosecutor's office, saying that the district attorney hires the "brighter students" to give them practical experience and said that "Miss Barnett, if I believe correctly, was one of those."

In introducing defense counsel, Judge Watson made no favorable comments on their abilities. He first introduced Nika Cummings, stating, "I'm sure glad she got married because I couldn't pronounce her last name before she got married. She must have married that guy with that last name to relieve me so I could pronounce her last name." He then introduced Kevin Loeffler, but apparently mispronounced his last name, whereon Judge Watson retorted, "I've known him a long time. I just didn't know how to pronounce his last name. Now, there's some things I can tell you about him, but that's just between me and him."

Plunkett contends that Judge Watson's personal and favorable remarks about the prosecutor "could only function" to persuade the jury that the State's allegations against him must be true. In contrast, the veiled comment about defense attorney Loeffler suggested to the jury, he contends, that the judge must have known something "improper or scandalous." In addition, Plunkett argues that Judge Watson further disparaged defense counsel with his remark that the defense always sits away from him at trial, followed by "[s]ometimes I wonder about that." In sum, Plunkett asserts that the judge's comments displayed to the jury a personal

prejudice favoring the State over the defense and that this "undoubtedly prejudiced" his chances of a fair trial. The State replies that Judge Watson's comments "were not to be taken seriously," that his "joking nature is apparent," and that "[t]here is no possibility these comments affected the outcome of the trial."

This first alleged instance of misconduct is serious. In *Hamilton*, we quoted from a prior opinion on the unique relationship between the judge and the jury:

" 'The trial judge occupies a high position. He presides over the trial. The jury has great respect for him. They can be easily influenced by the slightest suggestion coming from the court, whether it be a nod of the head, a smile, a frown, or a spoken word. It is therefore imperative that the trial judge shall conduct himself with the utmost caution in order that the unusual power he possesses shall not be abused.' " 240 Kan. at 545 (quoting *State v. Wheat*, 131 Kan. 562, 569, 292 Pac. 793 [1930]).

The potential combined effect of Judge Watson's stated suspicion of defense counsel's motive for sitting away from the bench, his praise for the prosecutor, his lack of praise for defense counsel, and his suggestion that he knew something he could not reveal about one of the defense attorneys put Plunkett's credibility in question from the start, before the jury was even selected. The credibility of witnesses was paramount in deciding the outcome of the instant case.

### Judge's Question to Police Chemist

Police chemist Mary Ayers testified that she found no seminal material in the swabs taken from either S.B. or C.D. Ayers' finding, of course, did not prove that the alleged victims had not been raped. Rather than leaving that point for counsel to argue in closing arguments, however, Judge Watson posed a question to Ayers at the conclusion of her testimony.

"I know the jury wants me to ask this. With those tests coming back negative, I heard you answer negative through all the tests that the defense just referred to and the District Attorney asked what were the results, it's in regards to the color purple, I believe. I saw a movie named that. *But, anyhow, with you having had to answer truthfully as a result of scientific tests, does that mean that you can say that the two individuals that provided those swabs was not raped?*" (Emphasis added.)

Essentially, the question was slanted in favor of the State. Judge Watson prefaced his question with the comment, "I know the jury wants me to ask this."

Where a trial judge deems it necessary to cross-examine a witness, the judge must exercise great care to prevent giving the jury the impression that he or she is biased against a party and the judge must not forget the function of a judge and assume that of an advocate. See *State v. Boyd*, 222 Kan. 155, Syl. ¶ 1, 563 P.2d 446 (1977). The question did not elicit any information from the witness; it called for a legal determination. Ayers had not been asked to give any opinions regarding the scientific evidence to which she testified. The question simply identified and inherently emphasized an argument that the State was bound to make, and did make, during closing argument.

Response to Defense Counsel's Objection to Judge's Question to Ayers

After Judge Watson asked the question discussed above, defense counsel objected and a lengthy bench conference was held. When the jury trial resumed, Judge Watson attempted to cure any prejudice caused by his previous question by asking witness Ayers if her tests could prove that the young women were raped, to which the obvious answer was, "No." Judge Watson added, after asking the question, "I truthfully looked for defense to offer that question . . . . I didn't disagree with you, but I did see the need to ask that." The defense again objected to the judge's second question for the "exact same reasons" that it had objected to the first question. Judge Watson retorted, "Exact personal reason, no legal reason that you gave."

Plunkett contends that the trial judge's response to his counsel's objection was discourteous and disparaging because it "implied to the jury that counsel was acting unprofessionally." It is difficult to construe Judge Watson's statement any other way than that defense counsel's objection was being made for personal reasons rather than legal reasons. This statement was made in open court with the jury present. There is no way to know whether jurors heard the statement and, if so, whether they understood it. In

any event, the statement was not warranted and supports a cumulative analysis of judicial misconduct. Also, the judge's comment that he "looked for defense to ask that question" implied that he thought defense counsel had made an error in not asking it. These remarks may have been particularly prejudicial in light of the judge's comments about the prosecutor and defense counsel at the beginning of the proceedings.

### Comment to the Jury Before Deliberations

After closing arguments, Judge Watson told the jury, "[Y]ou've heard all of the talk you're going to hear about this case right now, except what you all generate in carrying out your burden that—the final result of which you have to do that you don't like, *no more than the Court is going to enjoy his final obligation in regards to this case.*" (Emphasis added.) The defense objected to the judge's statement after the jury had retired to the jury room for deliberations, contending that it implied the judge believed he would be sentencing the defendant and, thus, that the judge believed defendant was guilty. Plunkett contends that this comment, at a critical time of trial just before deliberations, was prejudicial. We agree.

It is difficult to know how the jury interpreted the comment. In its context, the State contends that it was intended "to impress upon the jury that the determination of guilt was a heavy burden to be taken seriously." The comment came at the beginning of a long statement to the jury. However, in the case at bar, credibility is of dramatic importance. The State's case rested on S.B. and C.D. being believed.

Plunkett also advances the following claims of judicial misconduct, which, we conclude, when considered as part of a cumulative analysis in light of the previous allegations discussed, furnish additional support for reversal.

### Defense Counsel's Opening Statement

Judge Watson interrupted defense counsel's opening statement, although the State had made no objection. A lengthy hearing outside the presence of the jury followed. Judge Watson was apparently concerned that the defense was raising a situation that

it could not prove with evidence. The defense was eventually allowed to go on with its opening as before.

Plunkett contends that this interruption was prejudicial because it needlessly interrupted his counsel's opening, and the jury may have implied that his counsel had made some mistake. Although this interruption, alone, may not have substantially affected Plunkett's right to a fair trial, it did appear to be unwarranted absent an objection by the State.

### Cross-examination of S.B.

In cross-examining S.B., the defense was attempting to show that S.B. was confronted angrily by her grandmother when she returned home. Defense counsel asked S.B. if her grandmother "accused" her of being with a boy. Judge Watson interjected with a statement of his own belief of what the grandmother had done, based on S.B.'s prior testimony.

"Q: And at this point your grandmother accused you of being with the boy?
A: She said—she did not accuse me or nothing. She asked me had I been somewhere with some boy and I said, yes, I had and I told her what happened.
Q: Now, I think on direct in response to a question you said that your grandmother asked you have you been messing around with some boy?
A: Yeah, that's what she asked me.
Q: So she kind of accused you of being with a boy, would that be correct?
A: No, she didn't accuse me. She was—
THE COURT: It sounds like a question.
A: Yeah."

Again, the Judge's interjection here was unwarranted absent an objection by the State. Whether the grandmother confronted S.B. in an accusatory or merely inquisitive fashion was a potentially important question. The theory of the defense was that S.B. concocted a rape story out of fear of facing or disappointing her grandmother. The question of the character of the confrontation, and the larger question whether Plunkett's theory was credible, were matters for the jury to decide.

The question from defense counsel that drew Judge Watson's comment may have been objectionable as asked and answered; however, the State did not object. Judge Watson's interjection may have sent the message to the jury that he felt defense counsel's questioning was improper.

## Cross-examination of C.D.

Judge Watson interrupted defense counsel at one point during cross-examination of C.D. and said, "I'm going to let you go ahead because the District Attorney is not objecting, but I think you're fully aware that you're beyond direct, but you go ahead." Plunkett contends that this interruption was unwarranted because defense counsel's questioning was proper, and that this interruption disparaged his counsel in front of the jury. The judge interjected without any objection by the State.

This allegation is less severe than some others. Judge Watson made a similar comment to the prosecutor at one point in the trial, telling her that her cross-examination was so far beyond direct examination that she was in "left field now." However, that comment was prompted by an objection by the defense.

Viewing the entire record, we are unable to construe the judge's remarks discussed in this opinion as unobjectionable. We conclude that Plunkett's substantial rights to a fair trial have been prejudiced.

Several other issues are raised, including Judge Watson's rulings on (1) witness examination, (2) closing argument, (3) written questions from two jurors, (4) multiplicity of the charges, and (5) sentencing. We are reversing and remanding; consequently, we need not decide whether the above ancillary matters complained of constituted error or abuse of discretion.

The judgment is reversed. The case is remanded for further proceedings.